# EXHIBIT 1



sesameworkshop.

**LICENSE AGREEMENT**

**BETWEEN**

**SESAME WORKSHOP**

**AND**

**SEAWORLD PARKS & ENTERTAINMENT, INC.**

MAY 16, 2017

## TABLE OF CONTENTS

Page

1. BACKGROUND ......................................................................................................... 1
   1.01  Missions and Goals ........................................................................................ 1
   1.02  Prior Agreements ........................................................................................... 1
2. GRANT OF RIGHTS ................................................................................................ 2
   2.01  Sesame Street Elements ................................................................................. 2
   2.02  License to SEA .............................................................................................. 2
   2.03  New Characters .............................................................................................. 4
   2.04  SW's Reserved Rights .................................................................................... 5
3. EXCLUSIVITY ......................................................................................................... 5
   3.01  Theme Park Definition ................................................................................... 5
   3.02  Theme Park Exclusivity ................................................................................. 6
   3.03  Family Entertainment Centers ....................................................................... 6
   3.04  FEC Restrictions. ........................................................................................... 7
   3.05  Carve-outs ...................................................................................................... 8
   3.06  SW's FEC Partner and SEA ......................................................................... 11
   3.07  Additional Carveouts .................................................................................... 12
   3.08  Additional Restrictions on SW ..................................................................... 12
   3.09  Preparation for Post-Term ............................................................................ 13
   3.10  Requests for Changes .................................................................................... 13
4. CREATIVE DEVELOPMENT ................................................................................ 13
   4.01  Production of Live Presentations .................................................................. 14
   4.02  Music ............................................................................................................. 14
   4.03  Video .............................................................................................................. 15
   4.04  Artwork .......................................................................................................... 15
   4.05  Creative Materials ......................................................................................... 15
5. STANDALONE PARKS .......................................................................................... 16
   5.01  Definition ...................................................................................................... 16
   5.02  Langhorne Standalone Park .......................................................................... 16
   5.03  Standalone Park #2 ........................................................................................ 16
   5.04  Standalone Park #3. ....................................................................................... 18
   5.05  Standalone Park #4 ........................................................................................ 20

**TABLE OF CONTENTS**
(continued)

Page

5.06    SW Evaluation of Additional Standalone Parks ..................................................... 20

5.07    Quality of SW Standalone Parks .......................................................................... 21

5.08    SEA's Option for Future Standalone Parks .......................................................... 21

5.09    Standalone Park Refresh & Improvement ............................................................ 21

5.10    Standalone Park Marketing Commitment ............................................................. 22

6.    SESAME LANDS .......................................................................................................... 22

6.01    Definition .............................................................................................................. 22

6.02    Existing Sesame Lands ......................................................................................... 22

6.03    Orlando Sesame Land ........................................................................................... 23

6.04    Additional Sesame Lands ..................................................................................... 23

6.05    Closing Sesame Lands .......................................................................................... 24

6.06    Ongoing Investment .............................................................................................. 24

7.    LICENSED PRODUCTS ............................................................................................... 26

7.01    Rights Granted ...................................................................................................... 26

7.02    Retail Space .......................................................................................................... 26

7.03    SEA's and SW's Names on Licensed Products ..................................................... 27

7.04    Samples ................................................................................................................. 27

8.    ADDITIONAL SEA AND SW COMMITMENTS ....................................................... 27

8.01    SEA Responsibilities Generally ........................................................................... 27

8.02    Language ............................................................................................................... 28

8.03    Ratings Data .......................................................................................................... 28

8.04    Tickets ................................................................................................................... 28

8.05    Brand Board .......................................................................................................... 28

8.06    Quality Offerings .................................................................................................. 28

8.07    Inspection .............................................................................................................. 29

8.08    Public Announcements .......................................................................................... 29

8.09    SW Services .......................................................................................................... 29

9.    APPROVALS ................................................................................................................. 29

9.01    Definition .............................................................................................................. 29

9.02    Rights of Approval ................................................................................................ 29

**TABLE OF CONTENTS**
(continued)

                                                                              **Page**

      9.03    Approval Process ........................................................................................ 29

10.    ROYALTIES AND LICENSE FEES ............................................................ 31

      10.01  Payments ........................................................................................ 31

      10.02  Standalone Parks. ........................................................................... 31

      10.03  Sesame Lands and SeaWorld Orlando. ......................................... 32

      10.04  Licensed Products ........................................................................ 33

      10.05  Royalty Payments ........................................................................ 35

      10.06  Statements. .................................................................................... 36

      10.07  Audits. .......................................................................................... 36

      10.08  Costs Generally ............................................................................ 37

11.    SPONSORSHIP ........................................................................................... 37

12.    CHARITABLE FUNDING .......................................................................... 39

      12.01  Charitable Programs. ..................................................................... 39

      12.02  Charitable Contribution ................................................................ 39

      12.03  Gala .............................................................................................. 39

      12.04  Recognition .................................................................................. 40

13.    OWNERSHIP; INTELLECTUAL PROPERTY ......................................... 40

      13.01  Ownership of SW Materials. ......................................................... 40

      13.02  Legal Notices ............................................................................... 41

      13.03  Validity of Sesame Street Elements. ............................................ 41

      13.04  New Trademarks. .......................................................................... 41

      13.05  Protection of SW's Rights ............................................................ 42

      13.06  Ownership of SEA Materials ........................................................ 42

14.    REPRESENTATIONS, WARRANTIES, COVENANTS, AND
      INDEMNIFICATION ................................................................................... 43

      14.01  SW ................................................................................................ 43

      14.02  SEA .............................................................................................. 45

      14.03  Indemnification ............................................................................ 49

15.    ASSIGNMENT; CHANGE IN CONTROL; TRANSFER FEE ................... 50

      15.01  Transfers ...................................................................................... 50

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 15.02 | Change of Control | 50 |
| 15.03 | Affiliated Transfer | 50 |
| 15.04 | Continuing Obligations | 50 |
| 15.05 | Notice to SW and Approval | 51 |
| 15.06 | SW Disapproval | 51 |
| 15.07 | Transfer Fee | 51 |
| 15.08 | Notice to SEA and Approval | 52 |
| 15.09 | SEA Disapproval | 53 |
| 16. | EXPIRATION AND TERMINATION | 53 |
| 16.01 | Inventory Report | 53 |
| 16.02 | Termination by SW | 53 |
| 16.03 | Termination by SEA | 61 |
| 16.04 | SEA Brand Impairment | 65 |
| 16.05 | Effect of Expiration or Termination | 65 |
| 17. | DISPUTE RESOLUTION | 67 |
| 17.01 | Dispute Resolution | 67 |
| 17.02 | Binding Arbitration of Certain Disputes; Other Legal Remedies | 68 |
| 17.03 | Limitation on Types of Damages | 69 |
| 17.04 | Equitable Relief | 69 |
| 17.05 | Permitted Relief | 69 |
| 18. | CONFIDENTIALITY | 69 |
| 19. | NOTICES | 70 |
| 20. | GENERAL | 70 |
| 20.01 | Entire Agreement | 70 |
| 20.02 | No Continuing Waiver | 70 |
| 20.03 | Cumulative Remedies | 70 |
| 20.04 | Relationship of Parties | 70 |
| 20.05 | Governing Law | 70 |
| 20.06 | Severability | 71 |
| 20.07 | Binding on Successors | 71 |

**TABLE OF CONTENTS**
(continued)

**Page**

20.08  No Construction Against Drafting Party.................................................................... 71

20.09  Force Majeure ...................................................................................................... 71

20.10  Titles .................................................................................................................... 71

20.11  Including .............................................................................................................. 71

20.12  Counterparts........................................................................................................ 71

21.     DEFINITIONS..................................................................................................... 72

Exhibit A – Map for New York City Metropolitan Area
Exhibit B – Walkaround Costumed Character Appearance Guidelines
Exhibit C – Costume Maintenance Guidelines
Exhibit D – Bay of Play/Safari of Fun
Exhibit E – Process for Product Development and Approval
Exhibit F – Provision to be Included in Licensee's Contributor Agreements
Exhibit G – Manufacturer's Agreement
Exhibit H – Current Sesame Element Characters
Exhibit I  – Child Policy

EXECUTION VERSION



# sesameworkshop.

### LICENSE AGREEMENT
### BETWEEN
### SESAME WORKSHOP
### AND
### SEAWORLD PARKS & ENTERTAINMENT, INC.

This License Agreement ("**Agreement**") is dated May __, 2017 ("**Effective Date**") and is made by and between SESAME WORKSHOP ("**SW**") and SEAWORLD PARKS & ENTERTAINMENT, INC. ("**SEA**", "**Licensee**" or "**SeaWorld**"). SW is a New York not-for-profit corporation located at 1900 Broadway, New York, New York 10023. SEA is a Delaware corporation located at 9205 SouthPark Center Loop, Orlando Florida 32819. SEA is a wholly owned subsidiary of the publicly traded Delaware corporation SeaWorld Entertainment, Inc. SW and SEA are each a "**Party**" and together are the "**Parties**."

In consideration for the mutual obligations described below, SW and SEA hereby agree as follows:

## 1.   BACKGROUND

Missions and Goals. SW enters into this Agreement to further SW's mission to help children grow smarter, stronger, and kinder, and SW's goals to maximize exposure of the *Sesame Street*® brand and mission and financial benefits to SW, through the development and operation of a coordinated portfolio of Standalone Parks and Sesame Lands in SEA-owned Theme Parks. SW confirms and covenants that one of the most significant primary vehicles for promoting such mission is and will continue to be the "*Sesame Street*®" show and/or brand, and that SW will, throughout the Term, invest significant resources in the "*Sesame Street*®" show and/or brand to maintain it as a core focus, during the Term and within the Territory. SEA enters into this Agreement to further and enhance SEA's operation and promotion of its Theme Parks in the Territory and blending imagination with nature and enabling its guest to explore, inspire and act.

Prior Agreements. SW and SEA's Affiliate, SeaWorld Parks and Entertainment LLC ("**SPE**"), are parties to a license agreement dated August 24, 2006 (as amended) regarding the use of the Sesame Street Elements in Sesame Lands (such agreement and amendments are referred to collectively as the "**2006 Agreement**") and a license agreement dated April 1, 1983 (as amended) regarding the use of the Sesame Street Elements respecting the Langhorne Standalone Park (such agreement and amendments are referred to collectively as the "**1983 Agreement**"). The 2006 Agreement and 1983 Agreement are referred to collectively as the "**Prior Agreements**." SW and SEA agree that upon full execution of this Agreement, the Prior Agreements shall be terminated (and SEA shall cause SPE to execute this Agreement as indicated below to acknowledge such termination), and notwithstanding anything to the contrary

in the Prior Agreements, SPE shall not have any rights (e.g., sell-off rights) upon termination, and all of SW's and SPE's obligations, responsibilities and liabilities with respect their acts and omissions under the Prior Agreements shall be governed by the terms of this Agreement.

## 2.    GRANT OF RIGHTS

 Sesame Street Elements.

(a)    "**Sesame Street Elements**" shall mean all current and hereafter developed or owned titles, marks, names, characters (including any new *Sesame Street*® characters shown on *Sesame Street*® and owned in whole or controlled by SW), images, likenesses, audio, video, audiovisual, logos, themes, symbols, copyrights, trademarks, service marks, visual representations and designs, and other intellectual property (whether in two- or three-dimensional form and including animated and mechanical representations) owned or controlled by SW (or its Affiliates), and associated with the "*Sesame Street*®" television property, whether previously (unless retired) or currently on "*Sesame Street*®" or whether hereafter developed or owned and Sesame Street Elements will also include the names and marks "*Sesame Place*" and "*Sesame Land*," but expressly not include "Kermit the Frog." For illustrative purposes, a non-exhaustive list of the characters represented in the Sesame Street Elements in existence as of the date of this Agreement includes, but is not limited to, those characters set forth on **Exhibit H**.

(b)    If a character will be retired by SW (i.e., SW has made a final definitive decision to stop using and licensing such characters) and SEA has any theming that includes such retired character, then SEA will have one (1) year to replace such theming following written notice and actual retirement of such character; and provided further that SW's right to retire a character with respect to SEA's use will not include retirement of a major character, including without limitation Big Bird, Elmo, Cookie Monster, Bert, Ernie, Grover, Oscar the Grouch, Count von Count, Mr. Snuffleupagus, Abby Cadabby or Julia (if Julia becomes a major character).

(c)    Notwithstanding anything to the contrary, any use of the "Sesame Workshop" name and logo (including any successor name or logo or any house or umbrella brand) including (i) to the extent necessary to perform or exercise the rights and obligations under this Agreement (e.g., if related to sponsorship or social outreach); or (ii) to the extent necessary to depict the ownership of the Sesame Street Elements, is nonexclusive and will be subject to SW's prior written Approval (as defined in Section 9.01). However, both Parties will be permitted to use each other's names and logos as required by law or regulators (including required public company filings by SeaWorld Entertainment, Inc.) and in connection with the identification or description of the relationship of the Parties. Where feasible, SW will Approve pre-agreed form references for the Sesame Workshop name and logo.

 License to SEA.

(a)    Subject to all the provisions of this Agreement, SW grants SEA a license during the Term and within the Territory, to use the Sesame Street Elements, as agreed and Approved by SW:

SEA - Sesame Workshop License Agreement (2017-2031).docx

(i)    in connection with the design, building, installation, theming, promotion, and operation of the existing Standalone Park in Langhorne ("**Langhorne Standalone Park**") and additional Standalone Parks as mutually Approved under this Agreement;

(ii)    in connection with the design, building, installation, theming, promotion, and operation of its existing Sesame Lands (currently known as *Sesame Street*® Bay of Play at SeaWorld® San Antonio, *Sesame Street*® Bay of Play at SeaWorld® San Diego, *Sesame Street*® Safari of Fun at Busch Gardens® Tampa, and *Sesame Street*® Forest of Fun at Busch Gardens® Williamsburg) ("**Existing Sesame Lands**") and additional Sesame Lands as mutually Approved under this Agreement, including the Orlando Sesame Land pursuant to Section 6.03 hereof (and otherwise at SeaWorld Orlando pursuant to Section 10.03 until the Orlando Sesame Land opens);

(iii)    in connection with Licensed Products as set forth in Section 7;

(iv)    in marketing and promotional activities related to the Standalone Parks and Sesame Lands, including without limitation, marketing, advertising and promotion, character appearances and live presentations (both in park and in off-site promotional activities such as schools, parades, conventions, etc.), and the Licensed Products; it being understood that such marketing and promotion shall include all forms of media including but limited to print, television, the Internet, social media and other digital or similar platforms now existing or hereafter created throughout the world; and/or

(v)    to seek and to enter into sponsorship agreements for specific sponsorship of *Sesame Street*®-themed Attractions subject to SW's prior written Approval of the identity of the sponsor, general nature of the sponsorship and sponsorship acknowledgement and benefits.

(b)    (i)    The initial term of this Agreement will be from the Effective Date of this Agreement through December 31, 2031 ("**Initial Term**").

(ii)    Upon the actual opening date (the date opened to the public) of each new Standalone Park (as defined below), the Term of this Agreement will automatically extend for a period ending fifteen (15) years from December 31 of the year of such actual opening on identical terms and conditions ("**Fifteen Year Extension**").

(iii)    The Parties will have a mutual option to extend the Term for an additional five (5) years beyond the Fifteen Year Extension for both the Standalone Parks and Sesame Lands on identical terms and conditions mutually exercisable by the last business day of the ninth (9th) year of the Fifteen Year Extension.

(iv)    Additionally, during the period commencing not less than six (6) years prior to the then scheduled expiration of the Term (whether the Initial Term or any extension to the Term), the Parties will exclusively negotiate diligently and in good faith for a period of one (1) year (such 1-year period, or longer if extended by mutual agreement, is referred to as the "**Exclusive Negotiation Period**") following notice by either Party regarding potential renewal or extension of this Agreement. In the event that such negotiations are not successful, after the Exclusive Negotiation Period, the Parties will be permitted to continue to negotiate on a non-exclusive basis. Each Party acknowledges and agrees that, absent breach or early termination in

accordance with this Agreement, during the Exclusive Negotiation Period, neither Party will be permitted to seek or entertain proposals from or negotiate, directly or indirectly, with any other person or entity regarding the subject matter of this Agreement in the Territory.

(v)    The "**Term**" shall mean the Initial Term, each Fifteen Year Extension and any other renewals or extensions under this Agreement. The "**Opening Date**" of a new Standalone Park or Sesame Land will be the earlier of the mutually agreed opening date stated or agreed to under Section 5 or Section 6.03(a) ("**Mutually Agreed Opening Date**") or the actual opening date of such Standalone Park or Sesame Land.

(c)    The territory in respect of SEA's rights under this Agreement including the location and operation of Standalone Parks and Sesame Lands will be the United States of America, Puerto Rico and the U.S. Virgin Islands; except that the territory for marketing and promotion pursuant to Section 2.02(a)(iv) above is the world (the "**Territory**").

(d)    SEA will be entitled to use *Sesame Street®* walkaround characters for promotional appearances (e.g., Philadelphia Thanksgiving Parade, school visits, trade shows, hospitals, etc.) outside the Theme Parks operated by SEA that utilize the Sesame Street Elements under this Agreement ("**SEA Theme Parks**"), not to exceed fifty (50) miles from the promoted SEA Theme Park, to promote such SEA Theme Park in accordance with the following process: SEA will send SW a written request for Approval describing the specifics of the promotional appearance including dates, character, nature of the appearance and location, in an email with the subject line "SEAWORLD CHARACTER APPEARANCE OUTSIDE OF PARKS – URGENT" to the attention of SW's Vice President, Strategic Partnerships, Sponsorship & Themed Entertainment and SW's Senior Vice President & General Manager, North America Media & Licensing (or such other persons as designated by SW). If SW does not respond to the request within five (5) business days, the request will be deemed Approved. The foregoing does not prohibit SEA from requesting a walk-around character promotional appearance outside the fifty (50) mile radius which would be subject to SW Approval (and would not be deemed Approved pursuant to the process above). The Parties specifically agree that this is the only situation where non-response by SW is a deemed Approval under this Agreement.

(e)    Use of the Sesame Street Elements at resorts or hotels owned or affiliated with SEA through SEA's Official Hotel program (e.g., character breakfasts) will be subject to mutual Approval including good faith agreement on any applicable terms including financial terms.

█    New Characters. During the Term, with respect to any new characters in any new SW owned or controlled television show or digital series (with the understanding that such show or digital series will not be a substantial equivalent of "*Sesame Street®*" or feature any of the "*Sesame Street®*" characters), SW agrees that it will not grant Theme Park rights to such characters or series in the Territory without giving SEA an exclusive negotiating period of at least ninety (90) days to make an offer for such rights including remuneration to SW for the addition of such characters or series to this Agreement. SW will present such opportunity in writing to SEA as soon as reasonably practicable. Notwithstanding the foregoing, such exclusive negotiating period and right to make an offer will not apply if SW has granted or is required to grant such Theme Park rights for such television show or digital series to a production,

distribution or financing partner or other entity that has entered into an agreement for financing, distributing or broadcasting the show or series.

█    SW's Reserved Rights. SW reserves all rights not expressly granted to SEA and is free to exercise such rights (except for the restrictions expressly stated in this Agreement, including in Sections 3.02, 3.03, 3.04, 3.05, 3.08, 6.03(c) and 6.05(c)) at any time during the Term and within the Territory without obligation to SEA, commencing on the Effective Date of this Agreement.  SW agrees that, unless expressly permitted by this Agreement, such rights will not be exercised in connection with a SEA Competitor Theme Park as stated in Section 3.01. SW's reserved rights include without limitation the right to use or license the Sesame Street Elements in connection with live touring shows; museums; learning centers; schools; child care centers; after-school programs; walk-arounds; promotional events or tours; family shows, activities, events, and performances, and FECs (defined in Section 3.03(a)), and any limited engagement or other non-permanent venues or attractions, except to the extent of the restrictions expressly set forth in this Agreement, including in Sections 3.02, 3.03, 3.04, 3.05, 3.08, 6.03(c) and 6.05(c).

## 3.    EXCLUSIVITY

### 3.01    Theme Park Definition.

(a) "**Theme Park**" shall mean a type of visitor attraction that meets the following:

(i)    is in a permanent physical location (or a travelling equivalent thereof that remains at the same location for more than fourteen (14) days in any calendar year)

(ii)    occupies at least █ acres ████████████;

(iii)    is primarily made up of outdoor Attractions;

(iv)    is designed for a family experience generally longer than approximately five (5) hours;

(v)    has a single admission ticket (other than special shows);

(vi)    is designed, controlled and managed primarily for the enjoyment, amusement, and/or entertainment of the visiting public;

(vii)    is primarily engaged in operating some combination of a variety of attractions (and includes at least █ such Attractions) such as trams, mechanical rides, computer/arcade games and other games; education/discovery zones; participative demonstrations; interactive play areas (dry and/or water); tidal touch pools, petting zoos, and/or aviaries; aquariums, shows, parades, themed exhibits, live character shows/interaction and/or character dining or photos with characters, restaurants, refreshment stands, retail stores and picnic grounds ("**Attractions**"); and

(viii)    is commonly known as a theme park, adventure park, amusement park, zoo and/or wildlife attraction or park, and/or aquarium.

(b)    In addition to Theme Parks currently operated by SEA, the following is a non-exhaustive list of examples of competitor Theme Parks in the United States as of the date of this Agreement ("**Competitor Theme Parks**") (for avoidance of doubt, the term "Theme Park" includes Competitor Theme Parks): Disneyland®, Magic Kingdom, Epcot, Disney's Typhoon Lagoon, Disney's Animal Kingdom®, Disney's California Adventure™ Park, Disney's Hollywood Studios™, Legoland®, Six Flags®, Universal Studios™, Universal's Islands of Adventure™, Dollywood®, Silver Dollar City®, Cedar Point®, King's Island®, HersheyPark®, Orlando Thrill Park, San Diego Zoo®, Paramount Parks, California's Great America, Nickelodeon Universe®, Knott's Berry Farm®, Soak City®, Fun Spot™ America, Dutch Wonderland®, Knoebels Amusement Resort, San Diego Safari Park®, Holiday World & Splashin' Safari®, Silverwood Theme Park, Adventureland, Lake Compounce, Bay Beach Amusement Park, Virginia Safari Park, and Hawaiian™ Falls.  The Parties may by mutual agreement add to this list of Competitor Theme Parks.

████    Theme Park Exclusivity.  The license granted to SEA under Section 2.02 will be exclusive in the Territory during the Term in that SW will not use, license or transfer to any third parties any right to use any Sesame Street Elements in all or any part of any Theme Park (other than as expressly set forth herein), subject to any reduction in SEA's exclusive Territory under Sections 5 and 6.  There will be no other uses of the term "Sesame Place" during the Term in the Territory without SEA consent.  During the Term, there will be no other uses of the Sesame Place Big Bird logo/trademark (████) anywhere in the world.  In addition, during the Term and within the Territory, there will be no use of Big Bird alone (and in a group setting, no more prominent than other characters) in the name or logo for a Theme Park or FEC permitted under the terms of this Agreement.  For the avoidance of doubt, the immediately preceding sentence does not restrict SW's ability to use the trademark *Sesame Street*® street sign (████) for any purpose.

████    Family Entertainment Centers.

(a)    A family entertainment center ("**FEC**") shall mean a permanent physical facility that is not a Theme Park and that is designed and operated for the primary purpose of the entertainment (rather than education) of families and children, where the primary emphasis is on physical and interactive play, games, and activities.

(b)    A "**Small FEC**" shall mean an FEC with the following characteristics:

(i)    The total size of the Small FEC occupies less than ████████ ████████; and

(ii)    The *Sesame Street* ®Attractions in such Small FEC will not be designed for a family experience longer than approximately two (2) hours (except for special event bookings such as kids' birthday parties); and

(iii)    The Attractions in such Small FEC will not contain any roller coaster rides, water rides, carnival-type amusement rides or flat rides; and

SEA - Sesame Workshop License Agreement (2017-2031).docx

(iv)    No more than twenty-five percent (25%) of public space (including Attraction space) of such Small FEC will be outdoors.

(c)    A "**Standard FEC**" shall mean an FEC with the following characteristics:

(i)    The total size of the Standard FEC occupies ███████████████████████████████████████████; and

(ii)    The *Sesame Street*® Attractions in such Standard FEC will not be designed for a family experience longer than approximately three (3) hours (except for special event bookings such as kids' birthday parties); and

(iii)    The Attractions in such Standard FEC will not contain any roller coaster rides, water rides, or carnival-type amusement rides and no more than a total of two (2) flat rides; and

(iv)    No more than twenty-five percent (25%) of public space (including Attraction space) of such Standard FEC will be outdoors.

(d)    A "**Large FEC**" shall mean an FEC with the following characteristics:

(i)    The total size of the Large FEC occupies t███████████████████████████████████████████ and

(ii)    The *Sesame Street*® Attractions in such Large FEC will not be designed for a family experience longer than approximately four (4) hours (except for special event bookings such as kids' birthday parties); and

(iii)    The Attractions in such Large FEC will not contain any roller coaster rides or water rides and no more than a total of three (3) carnival-type amusement rides and/or flat rides; and

(iv)    No more than twenty-five percent (25%) of public space (including Attraction space) of such Large FEC will be outdoors.

3.04    FEC Restrictions.

(a)    Subject to the carve-outs in Section 3.05 below, during the Term (but subject to Section 3.04(b)(ii)), SW agrees to the following restrictions regarding FECs (and SW is not restricted with respect to Small FECs, Standard FECs and Large FECs outside of the radius restrictions below) (with such radius restrictions measured by Google Earth or some similar mechanism to determine such distance "as the crow flies"):

(i)    SW will not use, license or transfer the use of the Sesame Street Elements in any Small FEC that is located within a ██████ radius of a Standalone Park (or a location where the Parties have mutually agreed to build a Standalone Park) or ██████ radius of a Sesame Land (or a location where the Parties have mutually agreed to place a Sesame Land), and

(ii)    SW will not use, license or transfer the use of the Sesame Street Elements in any Standard FEC that is located within a ▮▮▮▮ radius of a Standalone Park (or a location where the Parties have mutually agreed to build a Standalone Park) or within a ▮▮▮▮ radius of a Sesame Land (or a location where the Parties have mutually agreed to place a Sesame Land), and

(iii)    SW will not use, license or transfer the use of the Sesame Street Elements in any Large FEC that is located within a ▮▮▮▮ radius of a Standalone Park (or a location where the Parties have mutually agreed to build a Standalone Park subject to the Orlando Exception under Section 5.04(d) to the extent applicable) or within a ▮▮▮▮ radius of a Sesame Land (or a location where the Parties have mutually agreed to place a Sesame Land).

(b)    (i)    Notwithstanding anything to the contrary, the restrictions in Section 3.04 and 3.05 do not apply to any authorized FECs that SW (or its FEC partner) has opened or that SW has contractually committed to open or authorized its FEC partner to open as permitted under this Agreement, prior to the Parties' mutual agreement to build (and subject to SEA's continuing diligent efforts to build in accordance with the terms of this Agreement) a new Standalone Park or Sesame Land in a specified location that creates the relevant radius restriction in Section 3.04(a) or 3.05. The Parties recognize that the FEC restrictions under this Agreement apply to the Langhorne Standalone Park and the existing Sesame Lands in existence on the Effective Date of this Agreement, the to-be-built Orlando Sesame Land and to any new Standalone Park and Sesame Land that the Parties mutually agree to build under this Agreement.

(ii)    Notwithstanding anything to the contrary, following expiration of the Exclusive Negotiation Period in Section 2.02(b)(iv) without the Parties entering into an extension of the Term or new agreement, SW is free, during the remainder of the Term, to use, license or transfer the use of the Sesame Street Elements to develop and build FECs that are subject to restrictions (including mileage restrictions) on SW under this Agreement, so long as such FECs do not open until after the end of the Term.

(c)    For the avoidance of doubt, in the event that SEA permanently closes or permanently ceases to operate any Standalone Park or Sesame Land or ceases to move forward with any new Sesame Land pursuant to Section 6.04, the FEC and other expressly stated restrictions in this Agreement associated with such Standalone Park or Sesame Land will no longer have any effect.

▮▮▮    Carve-outs. To the extent that an FEC is restricted under Section 3.04, SW and SEA agree that notwithstanding such restrictions, SW reserves the right to use, license or transfer the use of the Sesame Street Elements in FECs (Small FECs, Standard FECs and/or Large FECs as specified below) in the following metropolitan areas in accordance with the following and Section 3.06. Except as expressly set forth in Section 3.05(c)(v), "**Metropolitan Area**" shall mean the area designated by the United States Office of Management and Budget as the "metropolitan statistical area." The Approval standard for SEA referenced below in this Section 3.05 would include, among other things, good faith evaluation of data and other relevant information demonstrating any material negative or adverse consequences on the relevant Standalone Park or Sesame Land resulting from such FECs.

(a)    <u>Los Angeles (including Orange County, Long Beach, and Anaheim)</u>.

(i)    SW may exercise such right immediately (or later as determined by SW) to build and open ███████████████████████ ;

(ii)    Starting five (5) years after the opening of such FEC in subsection (i) above, SW will have the right to propose to open up to ██████ (the specific number requested will be at SW's option) additional Small and/or Standard FECs, subject to SEA's prior written Approval;

(iii)    Other than the initial ████████ FECs under (i) and (ii), additional FECs will be reviewed and Approved in groups of up to ██████ FECs (the specific number requested will be at SW's option);

(iv)    Upon any such Approval of the additional FECs, SW will have the discretion to open some or all of the number of approved Small and/or Standard FECs upon notice to SEA; provided, however, that if good faith development of an Approved FEC has not started within five (5) years from the date of SEA's Approval of the same (and continues to be diligently pursued), then SW shall be required to re-submit the request for such FEC to SEA (the Approval for the FECs that have begun development or have opened is not affected).

(b)    <u>Dallas</u>.

(i)    If SEA elects to build Standalone Park #2 in San Antonio (such decision will be made no later than t██████) months after the Effective Date of this Agreement), then

(A)    From the date of SEA's election and for ██████ years starting from the Opening Date of Standalone Park #2 in San Antonio, SW will not open any FECs in the Dallas Metropolitan Area;

(B)    After such period in (A) above, SW will have the right to propose to open up to ██████ (the specific number requested will be at SW's option) Small and/or Standard FECs in the Dallas Metropolitan Area, subject to SEA's prior written Approval;

(C)    Any additional Small and/or Standard FECs will be reviewed and Approved in groups of up to ██████ FECs (the specific number requested will be at SW's option);

(D)    Upon any such Approval of the additional Small and/or Standard FECs, SW will have the discretion to open some or all of the number of approved Small and/or Standard FECs upon notice to SEA; provided, however, that if good faith development of an Approved FEC has not started within ██████ years from the date of SEA's Approval of the same (and continues to be diligently pursued), then SW shall be required to re-submit the request for such FEC to SEA (the Approval for the FECs that have begun development or have opened is not affected).

SEA - Sesame Workshop License Agreement (2017-2031).docx

(ii)     If SEA elects not to build Standalone Park #2 in San Antonio (such decision will be made no later than ███████████ after the Effective Date), SEA will inform SW promptly and upon such notice, SW will be free to exercise its reserved rights to build and open Small and/or Standard FECs in the Dallas Metropolitan Area at any time, upon notice to SEA but without the need for approval by SEA.

(iii)     If SEA does not decide to open Standalone Park #2 in San Antonio (such decision being ███████████ after the Effective Date of this Agreement in San Antonio), but SEA elects to open a Standalone Park in San Antonio or Dallas after such ███████████ period, then the process set forth in Section 3.05(b) above would apply after SEA notifies SW of such decision to build a Standalone Park in San Antonio.

(c)     New York City.

(i)     Notwithstanding any restrictions in Section 3.04, starting on ███████████ ███, SW will be free to use, license or transfer the use of the Sesame Street Elements to build and open ███████████████████████████████████ in the New York City Metropolitan Area;

(ii)     Starting two (2) years after the opening of such FEC in subsection (i) above, SW will have the right to propose to open up to █████ (the specific number requested will be at SW's option) additional Small and/or Standard FECs subject to SEA's prior written Approval;

(iii)     Other than the initial █████ Small and/or Standard FECs under (i) and (ii), additional FECs will be reviewed and Approved in groups of up to █████ FECs (the specific number requested will be at SW's option);

(iv)     Upon any such Approval of the additional Small and/or Standard FECs, SW will have the discretion to build and open some or all of the number of approved FECs upon notice to SEA; provided, however, that if good faith development of an Approved FEC has not started within five (5) years from the date of SEA's Approval of the same (and continues to be diligently pursued), then SW shall be required to re-submit the request for such FEC to SEA (the Approval for the FECs that have begun development or have opened is not affected).

(v)     New York City Metropolitan Area means within a 50-mile radius of SW's offices at 1900 Broadway except that the boundary south and west of New York City will not include any location that is both west of Interstate 287 and south of Interstate 78 in New Jersey, as indicated in the map attached as **Exhibit A**.

(d)     Washington D.C.

(i)     At any time earlier than ███████████, if SEA elects to build a Standalone Park ███████████, SW will not open an FEC in the Washington, D.C. Metropolitan Area until after ███████████. Thereafter, starting ███████████ SW will have the right to propose to open up to ███████████ in the Washington, D.C. Metropolitan Area, subject to SEA's prior written Approval;

(ii)    At any time earlier than ███████████, if SEA decides that neither Standalone Park #2 nor Standalone Park #3 will be ███████████, SEA will inform SW promptly and upon such notice, SW will have the right to propose to open up to ██████ Small and/or Standard FECs in the Washington, D.C. Metropolitan Area, subject to SEA's prior written Approval.

(iii)    Other than the initial Small and/or Standard FECs Approved pursuant to subsections (i) and (ii) above, additional FECs will be reviewed and Approved in groups of up to ██████ FECs (the specific number requested will be at SW's option);

(iv)    Upon any such Approval of the above-described Small and/or Standard FECs, SW will have the discretion to build and open some or all of the number of approved Small and/or Standard FECs; provided, however, that if good faith development of an Approved FEC has not started within five (5) years from the date of SEA's Approval of the same (and continues to be diligently pursued), then SW shall be required to re-submit the request for such FEC to SEA (the Approval for the FECs that have begun development or have opened is not affected).

(e)    Detroit.

(i)    SW may exercise such right immediately to use, license or transfer the use of the Sesame Street Elements to build and open one Large FEC in the Detroit Metropolitan Area;

(ii)    SW may propose to open additional Large FECs subject to SEA's prior written Approval; provided, however, that if any SEA Approved FEC is not built and opened within five (5) years from the date of SEA's approval of the same, then SW shall be required to re-submit such request to SEA.

(iii)    If at any point SEA does not retain national exclusivity pursuant to Section 5, SW will have the right to build and open a Standalone Park in Detroit Metropolitan Area upon not less than ninety (90) days' notice to SEA but without the need for approval by SEA.

(iv)    For clarity, SW is free to immediately exercise its reserved right to build and open Small and/or Standard FECs in the Detroit Metropolitan Area without the need for Approval by SEA.

██████    SW's FEC Partner and SEA.  With respect to FECs opened pursuant to the carve-outs under Sections 3.05, 6.03(c) or 6.05:

(a)    provided that SW's FEC partner is amenable to co-investment by SEA, SW (or the SW's FEC partner) will use good faith efforts to provide SEA with not less than one hundred twenty (120) days to negotiate a mutually acceptable co-investment in such FEC based on co-investment metrics substantially similar to those metrics for SW Standalone Park co-investments in Section 5.04(b); and

(b)    SW will make reasonable efforts to facilitate discussions between the FEC partner and SEA regarding cross-promotions with SEA's Standalone Parks and Sesame Lands.

███ Additional Carveouts. With respect to new Standalone Parks and Sesame Lands that SEA will build and open under this Agreement, any additional cities (and specific FEC requests) that SW may seek to be added as carve-outs under Section 3.05 based on restrictions and criteria similar to those set forth in Section 3.05 will be subject to SEA's prior written Approval.

███ Additional Restrictions on SW.

(a)    (i) Notwithstanding SW's reserved rights under this Agreement, SW agrees that, during the Term (but subject to Section 3.09), it will not use, license, or transfer the use of the Sesame Street Elements in any visitor attraction that meets all of the following within the Territory of SEA's exclusive rights:

(A)    that is a permanent physical location that is designed primarily for enjoyment, amusement and/or entertainment (and not primarily for education or other purposes) (or a travelling equivalent thereof that remains at the same location for more than fourteen (14) days in any calendar year);

(B)    that is larger than a Large FEC;

(C)    that meets a substantial number but not all of the remaining criteria in the definition of a Theme Park; and

(D)    that reasonably is or would be considered to be (under a reasonable person standard) materially competitive with a Standalone Park or Sesame Land and inconsistent with SEA's rights pursuant to this Agreement.

████████████████████████████████████████████████████████████ For clarity, this is not intended to impact SW's ability to undertake its travelling live shows or its rights to build and operate Small, Standard and Large FECs pursuant to the terms of this Agreement.

(ii)    SW will notify SEA in writing, with sufficient detail regarding the visitor attraction, including its nature and scope so that the Parties can evaluate such visitor attraction against the criteria of this Section 3.08(a), of its intent to build (or license) and open a visitor attraction that meets the conditions under (A) and (B); and the Parties agree to evaluate such proposed visitor attraction in good faith within sixty (60) days after SW's written notice (and if necessary utilize dispute resolution hereunder). SW will include in its notice to SEA any market study or similar study to the extent SW has elected to obtain such study. To the extent a market study or similar study is undertaken by or with a partner of SW and such partner or the party conducting such market study requires confidential treatment of such study, SW will use good faith commercially reasonable efforts to obtain consent from such partner or market study party to disclose such market study to SEA, and SEA would enter an appropriate confidentiality agreement in connection therewith.

(b)    Subject to the carve-outs in Section 3.05, during the Term (but subject to Section 3.08(e) and Section 3.09), SW will not have the following *Sesame Street*®-themed Attractions as