**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SESAME WORKSHOP,

               Plaintiff,

     v.

SEAWORLD PARKS & ENTERTAINMENT,
INC., and UNITED PARKS & RESORTS INC.
F/K/A SEAWORLD ENTERTAINMENT, INC.,

           Defendants.

Case No.: 1:26-cv-2047

ECF Case

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR PARTIAL MOTION TO DISMISS**
**<u>PLAINTIFF'S AMENDED COMPLAINT</u>**

KASOWITZ LLP
Marc E. Kasowitz
Amit R. Vora
Maxwell Sandgrund
1633 Broadway
New York, New York 10019
Tel. (212) 506-1700
Fax (212) 506-1800
mkasowitz@kasowitz.com
avora@kasowitz.com
msandgrund@kasowitz.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT ALLEGATIONS............................................................................................. 3

STANDARD......................................................................................................................... 6

ARGUMENT........................................................................................................................ 6

I.     The Unfair-Competition Claim (Count III) Should Be Dismissed. ......................... 6

         A.     The Unfair-Competition Claim Is Duplicative of the Breach
               of-Contract Claim. ............................................................................. 6

         B.     Sesame Fails to Plead the Elements of Unfair Competition Under
               New York Law.................................................................................. 14

         C.     The Agreement's Damages Provisions Further Militate
               for Dismissing the Claim. ................................................................. 17

II.    The Implied-Covenant Claim (Count II) Should Be Dismissed as Duplicative. .............. 19

III.   The Request for Punitive Damages Should Be Dismissed. ............................................. 21

IV.   The Amended Complaint Should Be Dismissed in its Entirety as to United. .................. 22

CONCLUSION.................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*24/7 Recs., Inc. v. Sony Music Ent., Inc.*,
566 F. Supp. 2d 305 (S.D.N.Y. 2008)...............................................................17, 18

*Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA,
N.A. v. DB Structured Prods., Inc.*,
5 F. Supp. 3d 543 (S.D.N.Y. 2014) ........................................................................19

*A.W. Fiur Co. v. Ataka & Co.*,
71 A.D.2d 370 (1st Dep't 1979) ........................................................................23, 25

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*,
2019 WL 3066328 (S.D.N.Y. July 12, 2019), *aff'd*, 827 F. App'x 149 (2d Cir.
2020) ........................................................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................6

*AXA Mediterranean Holding, S.P. v. ING Ins. Int'l, B.V.*,
106 A.D.3d 457 (1st Dep't 2013) ............................................................................12

*BDG Gotham Residential, LLC v. W. Waterproofing Co.*,
2024 WL 4349163 (S.D.N.Y. Sept. 30, 2024).........................................................22

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
41 N.Y.2d 397 (1977) ..............................................................................................24

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
11 F. Supp. 3d 317 (E.D.N.Y. 2014) .......................................................................14

*Converged Compliance Sols., Inc. v. XOP Networks, Inc.*,
2024 WL 4665114 (S.D.N.Y. Sept. 25, 2024)...........................................................7

*Deutsche Bank Sec., Inc. v. Rhodes*,
578 F. Supp. 2d 652 (S.D.N.Y. 2008)......................................................................21

*DM Manager LLC v. Fid. Nat'l Info. Servs., Inc.*,
2024 WL 1347724 (S.D.N.Y. Mar. 29, 2024), *aff'd*, 2025 WL 863338 (2d Cir.
Mar. 19, 2025).............................................................................................................7

*Dormitory Auth. v. Samson Constr. Co.*,
30 N.Y.3d 704 (2018) ...........................................................................................6, 12

*GMH Cap. Partners v. Fitts*,
    2025 WL 950674 (S.D.N.Y. Mar. 28, 2025) ...............................................................6

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002).................................................................................19, 20

*Hassan v. Deutsche Bank A.G.*,
    515 F. Supp. 2d 426 (S.D.N.Y. 2007)......................................................................13

*Horsehead Indus., Inc. v. Metallgesellschaft AG*,
    239 A.D.2d 171 (1st Dep't 1997) .............................................................................23

*Huang v. iTV Media, Inc.*,
    79 F. Supp. 3d 458 (E.D.N.Y. 2015) ........................................................................22

*ICD Holdings S.A. v. Frankel*,
    976 F. Supp. 234 (S.D.N.Y. 1997) ...........................................................................19

*IKB International, S.A. v. Wells Fargo Bank, N.A.*,
    40 N.Y.3d 277 (2023) ...............................................................................6, 14, 17

*International News Serv. v. Associated Press*,
    248 U.S. 215 (1918)...................................................................................................15

*ITC Ltd. v. Punchgini, Inc.*,
    9 N.Y.3d 467 (2007) .................................................................................................14

*Katz v. Esurance Prop. & Cas. Ins. Co.*,
    2025 WL 750937 (E.D.N.Y. Mar. 10, 2025) .............................................................7

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
    2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016)..........................................................20

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    84 N.Y.2d 430 (1994) ...............................................................................................19

*Murphy v. Am. Home Products Corp.*,
    58 N.Y.2d 293 (1983) ...............................................................................................21

*My Mavens, LLC v. Grubhub, Inc.*,
    2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023)..........................................................12

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
    766 F.3d 212 (2d Cir. 2014).....................................................................................23

*New York Univ. v. Continental Ins. Co.*,
    87 N.Y.2d 308 (1995) ...............................................................................................22

*OFSI Fund II, LLC v. Canadian Imperial Bank of Com.*,
  82 A.D.3d 537 (1st Dep't 2011) .................................................................................12

*Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*,
  2020 WL 6151491 (S.D.N.Y. Oct. 20, 2020) ....................................................23, 25

*Primula Mgmt., LLC v. Primrose Sch. Franchising Co. LLC*,
  2026 WL 508755 (S.D.N.Y. Feb. 24, 2026)...................................................................7

*Red Mountain Med. Holdings, Inc. v. Brill*,
  563 F. Supp. 3d 159 (S.D.N.Y. 2021)....................................................................15, 16

*Resorts Grp., Inc. v. Cerberus Capital Mgmt., L.P.*,
  213 A.D.3d 621 (1st Dep't 2023) ...............................................................................23

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
  893 F. Supp. 285 (S.D.N.Y. 1995) ..............................................................................22

*Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*,
  894 F. Supp. 2d 288 (S.D.N.Y. 2012).........................................................................15

*Ruder & Finn Inc. v. Seaboard Sur. Co.*,
  52 N.Y.2d 663 (1981) .................................................................................................15

*Sadkhin Franchising Co. LLC v. Zamora*,
  2026 WL 1162497 (E.D.N.Y. Apr. 29, 2026) ...............................................................7

*Sterling Select II Advisory, LLC v. Argus Info. & Advisory Servs., Inc.*,
  2026 WL 734047 (S.D.N.Y. Mar. 16, 2026) .................................................................7

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005)..........................................................................................22

*World Wide Packaging, LLC v. Cargo Cosmetics, LLC*,
  193 A.D.3d 442 (1st Dep't 2021) ...............................................................................24

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .........................................................................1

**PRELIMINARY STATEMENT**

Defendants SeaWorld Parks & Entertainment and United Parks & Resorts move to dismiss several branches of Plaintiff Sesame Workshop's Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As shown below, Sesame fails to state its implied-covenant claim (Count II), its unfair-competition claim (Count III), and its demand for punitive damages; and the pleading should be dismissed in its entirety against United. Those portions of the Amended Complaint founder on the same fundamental defect: they disregard that, for nearly a decade, Sesame and SeaWorld have operated under a comprehensive License Agreement controlling the use of the Sesame Street brand at SeaWorld's theme parks. The Agreement— negotiated by sophisticated parties and refined through a 45-year relationship—defines the rights, duties, and remedies that govern this dispute. The Agreement prescribes the royalties that Sesame seeks, the approval rights that it alleges were ignored, the quality standards that it alleges were abandoned, and the consequences of the park closures of which it complains. Sesame's pleading, however, purports to allege claims barred by the Agreement and established law and is animated by baseless, extraneous, and at times absurd allegations that distract from the Agreement's plain, bargained-for terms. The motion should be granted so that the Court and the parties may focus on the contractual essence of the dispute rather than the sideshow that Sesame stages around it.

**I**. Sesame's allegations that SeaWorld committed the tort of unfair competition fail to state a claim because they are, at their core, duplicative of allegations that SeaWorld breached the Agreement. Under settled New York law, a tort claim cannot proceed alongside a breach-of-contract claim where, as here, it merely restates the same conduct in different terms. The touchstone is whether the tort essentially arises from the contract, and Sesame's claim flunks that test at every turn. Sesame's allegation about the closure and seasonal-schedule transition of Sesame Place San Diego is pleaded as a breach of the Agreement's quality-maintenance and

approval provisions. The allegation about the inclusion of the Sesame Place logo and Big Bird image in the closure announcement is pleaded as a breach of the same approval rights. The allegation about the replacement of the Sesame Street Bay of Play in San Antonio is pleaded as a breach of the provision that fixes a termination fee for precisely that event. The allegation about the exploration of replacement licensing partners and reduced brand promotion is pleaded as a breach of the Agreement's quality commitment and the implied covenant. And the allegation about the Fun Cards "diversion" is pleaded as a breach of the same approval rights, measured against the same royalty and termination-fee provisions. Conduct that Sesame's pleading describes, provision by provision, as a breach of the Agreement may not be dressed up as an independent tort.

Sesame's conclusory labels—*e.g.*, "willful," "retaliatory," "in bad faith"—do not change the analysis. For example, while Sesame speculates that SeaWorld breached the Agreement to get back at Sesame for Sesame's seeking to recover an arbitration award, that fantastical allegation is not only unsupported by any alleged facts that would nudge it over the *Iqbal-Twombly* plausibility line—it is also a non sequitur. An allegation about *why* SeaWorld supposedly breached the Agreement supplies neither a duty independent of the Agreement nor an injury beyond the one that the breach-of-contract claim already captures. New York courts have squarely rejected the idea that branding a breach malicious or willful transforms it into a tort. A retaliatory motive is a claim that the breach was deliberate—and a deliberate breach is still a breach.

Aside from the independent-tort doctrine, the unfair-competition claim is defective because Sesame fails to plead the claim's elements. Rather than pleading that SeaWorld misappropriated a commercial advantage—unfair competition's gravamen—Sesame pleads that SeaWorld used Sesame's marks in ways that the Agreement governs. Such allegations sound in contract, not tort.

**II**. Nor does Sesame adequately plead that SeaWorld breached the implied covenant of

good faith and fair dealing. Because the allegations supporting the implied-covenant claim mirror those supporting the breach-of-contract claim, the former is duplicative as a matter of law.

**III**. Sesame's demand for punitive damages cannot survive, either. Punitive damages are not permitted when the challenged conduct arises from a contractual relationship, unless the plaintiff can plead, among other things, that the conduct was part of a pattern of similar conduct directed at the public generally. Sesame pleads no such pattern—only a private licensing dispute between two sophisticated parties—and a single course of conduct directed at one counterparty does not meet that demanding standard.

**IV**. Finally, the entire pleading fails as against United, which is not a party to the Agreement. Sesame's threadbare allegations of parent-company participation in negotiations of the Agreement do not make United a proper party here or otherwise state any claim against it.

## RELEVANT ALLEGATIONS[1]

For over 45 years, Sesame has licensed its Sesame Street brand to SeaWorld for theme-park use under successive license agreements executed in 1983, 2006, and 2017. AC ¶¶ 3, 34–35, 37. The 2017 Agreement is the contract at issue. AC ¶ 37. SeaWorld "is a party to the Agreement"; United wholly owns SeaWorld and did not sign the Agreement. AC ¶¶ 16–17, 125. Under the Agreement, SeaWorld operates two standalone Sesame Place parks (Langhorne and San Diego) and Sesame Land attractions within its SeaWorld and Busch Gardens parks, in exchange for the royalties and license fees that Section 10 prescribes. AC ¶¶ 38–39, 43.

The Agreement comprehensively allocates the parties' rights, obligations, and remedies. It grants Sesame approval rights over uses of its intellectual property, marketing materials, public announcements, and live presentations (§§ 9.02, 9.03, 8.08, 4.01; AC ¶¶ 69, 86); imposes on

---

[1] The following facts are drawn from the Amended Complaint ("AC") and the License Agreement attached to and incorporated in it (AC Ex. 1, the "Agreement"), and are assumed to be true solely for purposes of this motion.

SeaWorld quality, reporting, and business-review obligations (§§ 8.03, 8.05, 8.06, 10.06, 14.02(b); AC ¶¶ 52, 71–72, 88); and prices the consequences of park closures in advance: liquidated damages if SeaWorld elects not to open a third standalone park (§ 5.04(d); AC ¶ 56), and termination fees on the permanent closure of an existing Sesame Land (§§ 6.05(b), 16.02(c); AC ¶ 60).

The Agreement's remedial architecture is particularly exhaustive. Section 16.02(b) makes termination plus accrued amounts Sesame's "sole and exclusive remedy" for a SeaWorld breach; Section 16.02(c) fixes the termination fees as liquidated damages, prescribes a defined formula for calculating them, and caps them at a substantial amount; Section 17.03 categorically bars consequential, punitive, exemplary, and lost-profits damages "whether such liability is based on breach of contract, tort, strict liability, breach of warranties, or otherwise"; and Section 17.01 prescribes a mandatory pre-suit dispute-resolution process of notice, senior-management discussion, and mediation. AC ¶¶ 67, 109, 117, 121.

The relationship deteriorated after a 2022 royalty dispute over Sesame Place Langhorne, which Sesame arbitrated to an award in 2023 and reduced to a final judgment that SeaWorld satisfied on October 24, 2025. AC ¶ 5. Sesame alleges that "[s]ince losing the arbitration," SeaWorld has engaged in "a series of willful, unilateral retaliatory breaches." AC ¶ 48. According to Sesame, SeaWorld stopped paying royalties and submitting royalty reports in the fall of 2025 (AC ¶¶ 49, 53); declined to open the third standalone park and did not pay the liquidated damages that Sesame invoiced (AC ¶¶ 55–58); closed the Sesame Street Bay of Play at SeaWorld San Antonio and did not pay the termination fees that Sesame invoiced (AC ¶¶ 59–62); transitioned Sesame Place San Diego to a seasonal schedule, announced the change publicly without Sesame's approval, and issued SeaWorld Fun Cards to that park's season-pass holders (AC ¶¶ 64–65, 94); distributed marketing materials and announced a new live show without approval (AC ¶¶ 80–87);

4

and stopped convening the parties' Brand Board (AC ¶¶ 88–89). Sesame further alleges that SeaWorld's motives for its contractual breaches were financial: because the Agreement ties termination fees to the park's historical royalties, lowering current royalties lowers SeaWorld's termination-fee exposure. (AC ¶¶ 6, 48, 67, 157.)

On September 29, 2025, SeaWorld wrote to Sesame asserting that Sesame had breached Section 1.01's brand-investment commitment—an assertion that the Amended Complaint brushes aside, without explanation, as purportedly "false" and "pretext." AC ¶¶ 101–02, 169. On November 25, 2025, Sesame served a notice of breach, triggering Section 17.01's dispute-resolution process. AC ¶ 110. Senior management discussed the dispute on January 6, 2026, without resolution. AC ¶¶ 111–12. On January 13, "SeaWorld initiated mediation" (AC ¶ 113); paragraph 126 separately alleges that United submitted the mediation request to JAMS "under its own corporate name." The parties mediated to impasse on March 12, 2026, completing the Section 17.01 process before Sesame commenced this action within hours of impasse. AC ¶¶ 114–15.

Sesame's Amended Complaint brings four counts against both Defendants, which it defines collectively as "SeaWorld." In Count I, Sesame alleges that SeaWorld breached numerous provisions of the Agreement and seeks unpaid amounts, termination, and termination fees under Section 16.02. AC ¶¶ 123–42. In Count II, Sesame re-pleads the same conduct as a breach of the implied covenant of good faith and fair dealing, "expressly pleads in the alternative," and demands punitive damages. AC ¶¶ 143–54. In Count III, Sesame alleges that actions "beyond the breach of the Agreement"—the San Diego seasonal transition, the Fun Cards, the closure announcement, and reduced brand promotion—constitute common-law unfair competition under New York law, again demanding punitive damages. AC ¶¶ 155–65. In Count IV, Sesame seeks a declaration that Sesame did not breach the Agreement. AC ¶¶ 166–72. As to United, Sesame's sole differentiating

allegation appears in paragraph 126: that United "manifested its intent to be bound by the Agreement through participating in negotiations for the Agreement," through "at least one officer" who "participated" in the 2017 negotiation and through the January 2026 mediation request.

## STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "If the plaintiff has not nudged the claims across the line from conceivable to plausible, the complaint must be dismissed." *GMH Cap. Partners v. Fitts*, 2025 WL 950674, at *5 (S.D.N.Y. Mar. 28, 2025) (citation modified).

## ARGUMENT

## I.  The Unfair-Competition Claim (Count III) Should Be Dismissed.

### A.  The Unfair-Competition Claim Is Duplicative of the Breach-of-Contract Claim.

"[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 711 (2018) (citation modified). The Court of Appeals reaffirmed this rule in *IKB International, S.A. v. Wells Fargo Bank, N.A.*, instructing courts to thwart duplication by evaluating breach-of-contract and tort counts in terms of "the nature of the injury, how the injury occurred and the harm it caused." 40 N.Y.3d 277, 286 (2023) (citation modified). So where, as here, a plaintiff is "*essentially* seeking enforcement of the bargain," the action sounds in contract, not tort. *Id.* (citation modified) (emphasis added). Put differently, substance overrides form, and "when a valid agreement governs the subject matter of a dispute between parties, claims *arising from* that dispute

6

are contractual and cannot be repackaged as tort claims." *DM Manager LLC v. Fidelity Nat'l Info. Servs., Inc.*, 2024 WL 1347724, at *5 (S.D.N.Y. Mar. 29, 2024) (citation modified) (emphasis added), *aff'd*, 2025 WL 863338, at *2 (2d Cir. Mar. 19, 2025).

New York's independent-tort doctrine extends to unfair-competition claims. As this Court put the point, "a claim of unfair competition does not survive if its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract." *Id.* at *8 (citation modified) (dismissing unfair-competition claim as duplicative where "the underlying relationship [was] created through the contract"); *see also Sterling Select II Advisory, LLC v. Argus Info. & Advisory Servs., Inc.*, 2026 WL 734047, at *18 (S.D.N.Y. Mar. 16, 2026) (dismissing tortious-interference claim as duplicative where the "business relationship" was "premised on" the terms at issue in the breach-of-contract claim); *Primula Mgmt., LLC v. Primrose Sch. Franchising Co. LLC*, 2026 WL 508755, at *16 (S.D.N.Y. Feb. 24, 2026) (dismissing unjust-enrichment claim that "relie[d] on" breach-of-contract allegations); *Converged Compliance Sols., Inc. v. XOP Networks, Inc.*, 2024 WL 4665114, at *11 (S.D.N.Y. Sept. 25, 2024) (dismissing misappropriation claim that "rel[ied] on the same facts that underlie[d] a breach of contract claim"); *Sadkhin Franchising Co. LLC v. Zamora*, 2026 WL 1162497, at *7 (E.D.N.Y. Apr. 29, 2026) (dismissing unfair-competition claim that "rest[ed] upon" the breach-of-contract allegations); *Katz v. Esurance Prop. & Cas. Ins. Co.*, 2025 WL 750937, at *11 (E.D.N.Y. Mar. 10, 2025) (dismissing conversion claim that "remain[ed] rooted in [defendant's] alleged breach of the terms of the [insurance] policy").

Here, Sesame's unfair-competition claim cannot survive New York's deeply rooted independent-tort rule. As the discussion below illustrates, the allegations underlying Sesame's unfair-competition claim are, at their core, allegations that SeaWorld breached its contractual

7

obligations under the Agreement.

*The Sesame Place San Diego closure and seasonal-schedule transition.* To support its unfair-competition claim, Sesame alleges that SeaWorld "closed a Sesame Land and abruptly transitioned Sesame Place San Diego to a seasonal schedule." AC ¶ 157. But before Sesame's pleading recast that conduct as a tort, the pleading described that conduct as a contractual breach. In Sesame's telling, SeaWorld's unannounced closure and seasonal-schedule transition of Sesame Place San Diego breached: Section 8.06, which requires SeaWorld to "maintain the quality of its product offerings at [its] Theme Parks to achieve its purpose of providing broadly accessible, quality entertainment experiences and engagement" (AC ¶ 71); Section 14.02, which requires SeaWorld "to operate [its] Theme Parks in a manner consistent with the terms of Section 8.06" (AC ¶ 72); and Section 9.02, under which Sesame "retains the right to Approve … all aspects of all Attractions, all Live Presentations and all Live Presentation Materials that are based on the Sesame Street Elements," "all marketing and promotional activities and all Marketing Materials prior to [SeaWorld]'s use thereof," and "any use of any element of the Sesame Street Elements for any purpose." AC ¶ 69. In fact, Sesame expressly alleged: "SeaWorld breached these provisions by announcing the closure and schedule changes to Sesame Place San Diego without notifying Sesame Workshop or allowing Sesame Workshop an opportunity to approve the messaging." AC ¶ 70; *see also* AC ¶ 68 (alleging that closing Sesame Place San Diego "violates numerous provisions of the Agreement relating to Sesame Workshop's right to approve the use of its IP and SeaWorld's obligations to maintain the quality of its offerings"); AC ¶ 71 ("The abrupt closure also violates SeaWorld's 'commit[ment]' under Section 8"); AC ¶ 73 ("[R]ather than maintaining quality and providing 'broadly accessible' entertainment, SeaWorld closed the Sesame Land San Diego park with little warning to consumers and without any justification … "); AC ¶ 129 (alleging

8

breach of Section 9); AC ¶ 133 (alleging breaches of Sections 8 and 14). Although Sesame is patently wrong that SeaWorld is liable for breaching the Agreement, the point for present purposes is that Sesame's unfair-competition allegations concerning the San Diego closure and seasonal-schedule transition arise from SeaWorld's obligations under Sections 8.06, 9.02, and 14.02.

*The Sesame Place logo and Big Bird image in the closure announcement.* Sesame also alleges, in support of its unfair-competition claim, that "[b]ecause the Sesame Place logo utilizes Sesame Workshop's IP (*e.g.*, the name Sesame and the Big Bird image) and was featured in SeaWorld's unauthorized announcement of the park closure, SeaWorld misleadingly suggested that Sesame condoned or supported the closure." AC ¶ 159. But the only wrong Sesame identifies is that the announcement was issued without its approval—and that is conduct Sesame's pleading squarely casts as a contractual breach. Under Section 9.02, Sesame "retains the right to Approve … all marketing and promotional activities and all Marketing Materials prior to [SeaWorld]'s use thereof" and "any use of any element of the Sesame Street Elements for any purpose." And Sesame alleged precisely that breach in Count I: "SeaWorld has materially breached Section 9.02 of the Agreement by announcing the closure and schedule changes to Sesame Place San Diego without notifying Sesame Workshop or allowing Sesame Workshop an opportunity to approve of messaging, as required for such public announcements under Section 8.08." AC ¶ 129. That treatment is of a piece with how the pleading characterizes every instance of unapproved branding—each is labeled a breach of Section 9.02. *See* AC ¶ 83 ("SeaWorld's posting of unauthorized marketing materials constitutes a material breach of Section 9.02 of the Agreement"); AC ¶ 84 ("In another breach of Section 9.02 of the Agreement"); AC ¶ 85 ("This is yet another blatant breach of Section 9.02"). The unfair-competition allegation concerning the logo and Big Bird image therefore arises from the Agreement.

*The Bay of Play replacement at SeaWorld San Antonio.* Sesame's unfair-competition claim is additionally premised on the allegation that "SeaWorld has already replaced its Sesame Street-themed attraction with another brand at SeaWorld San Antonio." AC ¶ 160; *see also* AC ¶ 157 (alleging that "SeaWorld closed a Sesame Land"). But the Agreement anticipates that precise event and fixes a contractual remedy for it. Under Section 6.05(b), "[i]f at any time [SeaWorld] permanently closes or permanently ceases operation of an Existing Sesame Land … other than to replace it with a Standalone Park, … [SeaWorld] will pay [Sesame Workshop] the applicable [SeaWorld] Termination Fees under Section 16.02(c)." And Sesame pleaded that obligation as breached in contract terms in Count I: "SeaWorld breached this provision by failing to pay termination fees for the closure of an Existing Sesame Land, the Sesame Street Bay of Play in San Antonio." AC ¶ 137; *see also* AC ¶ 62 ("SeaWorld has failed to pay this termination fee as required under the Agreement, and thus has breached the contract and currently owes the full amount plus interest."). The unfair-competition allegation concerning the Bay of Play replacement is accordingly nothing more than a dressed-up breach-of-contract allegation.

*The exploration of replacement licensing partners and reduced promotion of the Sesame Street brand.* Sesame further alleges, in support of its unfair-competition claim, that "instead of fulfilling its obligations under the Agreement, SeaWorld is also in active discussions with other IP licensing partners to replace Sesame Workshop," and that "[r]ather than acting as a good steward of the Sesame Street brand, SeaWorld has acted in bad faith to harm Sesame Workshop through cutting back on promoting the Sesame Street brand." AC ¶ 160. But Sesame's own framing situates that conduct in the Agreement: the pleading faults SeaWorld for acting "instead of fulfilling its obligations under the Agreement." AC ¶ 160. To the extent any duty to promote the brand exists, it arises from Section 8.06, under which SeaWorld "will maintain the quality of its product

10

offerings at [SeaWorld]-owned Theme Parks to achieve its purpose of providing broadly accessible, quality entertainment experiences and engagement for its guests." And Sesame pleads that very obligation as breached in Count I—"SeaWorld has materially breached these provisions by abruptly closing Sesame Land San Diego on a week's notice, and transitioning the park to a seasonal schedule. In so doing, SeaWorld failed to provide 'broadly accessible, quality' entertainment experiences," AC ¶ 133—and as a breach of the implied covenant in Count II, alleging that SeaWorld "failed to use good faith efforts to promote the Sesame Street brand at its parks," AC ¶ 150. Because the unfair-competition allegation concerning replacement partners and reduced promotion is, in essence, contractual in nature, it cannot sustain a tort claim.

*The Fun Cards "diversion."* Finally, Sesame alleges that "in a message released under the Sesame Place logo, SeaWorld gave season pass holders for Sesame Place San Diego SeaWorld Fun Cards for unlimited access to SeaWorld's San Diego park and directed customers to attend SeaWorld San Diego's holiday events in lieu of cancelled holiday events at Sesame Place San Diego." AC ¶ 158. Each component of that theory implicates the Agreement. The vehicle for the alleged diversion—the announcement bearing the Sesame Place logo—is the same press release that Sesame pleads as a Section 9.02 approval breach in Count I, under which Sesame "retains the right to Approve … all marketing and promotional activities and all Marketing Materials prior to [SeaWorld]'s use thereof." AC ¶ 129. The revenue arrangement that the diversion allegedly disrupted is itself contractual: the royalties that Sesame and SeaWorld negotiated under Section 10, which provides that "[i]n consideration for the license and rights granted to [SeaWorld] under [the] Agreement, [SeaWorld] will pay [Sesame] the annual license fees and royalties," and which Sesame pleads as the framework governing the at-issue revenues, AC ¶¶ 95–96. Like the rest of the misconduct alleged in the unfair-competition claim, the Fun Cards diversion relates to

11

SeaWorld's obligations under the Agreement, triggering the independent-tort bar.

To be sure, Sesame will lean on conclusory terms sprinkled throughout its pleading—*e.g.*, "willful," "in bad faith," "retaliatory"—in an effort to escape New York's independent-tort principle. But New York law rejects that gambit. The "mere allegation that the alleged breach of contract was 'maliciously intended' or constituted 'willful misconduct' does not render the breach of contract claim a separate and independent tort claim." *AXA Mediterranean Holding, S.P. v. ING Ins. Int'l, B.V.,* 106 A.D.3d 457, 458 (1st Dep't 2013); *accord OFSI Fund II, LLC v. Canadian Imperial Bank of Com.*, 82 A.D.3d 537, 539 (1st Dep't 2011); *see also My Mavens, LLC v. Grubhub, Inc.*, 2023 WL 5237519, at *24 (S.D.N.Y. Aug. 14, 2023) ("[A] plaintiff cannot merely dress up a contract claim with allegations of intentional conduct and thus convert it into a tort claim."). Given that proposition, Sesame cannot soundly predicate its unfair-competition claim on the allegation, for example, that SeaWorld breached the Agreement because SeaWorld purportedly desired to get back at Sesame for the arbitration award. AC ¶¶ 157, 162. Such conjecture about SeaWorld's *motive* for breaching the Agreement is wholly unsupported, absurd, and false— indeed, the notion is plucked from thin air. Still more, Sesame's speculation about *why* SeaWorld breached the Agreement is, in essence, an allegation that sounds in contract, not in tort. The fundamental, complained-of misconduct remains SeaWorld's purported violation of the Agreement, rather than SeaWorld's purported violation of separate duties owed to Sesame outside the Agreement's four corners. The wrong remains the breach, and a retaliatory motive supplies neither a "legal duty independent of the contract itself," *see Dormitory Auth.*, 30 N.Y.3d at 711, nor any "injury … not already encompassed in" the contract claim, *see id.* at 713. Sesame's pleading failure—that is, its failure to identify independent duties owed to Sesame, collateral to the Agreement, which SeaWorld violated—is fatal to Sesame's unfair-competition claim.

The contractual core of Sesame's unfair-competition claim is only underscored by Sesame's allegation that SeaWorld breached the Agreement to "lower royalties" and "reduce its exposure in termination fees." AC ¶ 67; *see also* AC ¶ 150 (alleging that SeaWorld acted to "minimize its liability for termination fees"). The allegation that SeaWorld breached the Agreement for economic self-interest is, again, an allegation about SeaWorld's motive for its contractual breach—not about an independent tort. Further, Sesame's allegation about SeaWorld's economic self-interest contradicts—and clinches the implausibility of—Sesame's allegation about SeaWorld's retaliatory conduct. "A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm." *Hassan v. Deutsche Bank A.G.*, 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007) (addressing tortious interference with business relations) (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)), *aff'd*, 336 F. App'x 21 (2d Cir. 2009). On this score, Sesame's allegation in paragraph 162—that SeaWorld took "actions that offered SeaWorld no economic benefit"—is not only inexplicable and conclusory, but it cannot be reconciled with Sesame's allegations in paragraphs 67 and 150 and is entitled to no consideration on this motion.

*Apotex* is instructive. There, the plaintiff and the defendant contracted to jointly develop and commercialize pharmaceutical products, after which—as alleged—the defendant misappropriated confidential pricing information in violation of a contractual confidentiality obligation and used it to unfairly compete with the plaintiff, including by exploiting the plaintiff's confidential pricing information to match its prices and to steal its customers. *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2019 WL 3066328, at *6 (S.D.N.Y. July 12, 2019), *aff'd*, 827 F. App'x 149 (2d Cir. 2020). Although the plaintiff had woven allegations of "wrongful" conduct into its pleading, its unfair-competition and other tort claims were dismissed as duplicative because, at bottom, they "implicate[d] matters covered by the [a]greement" and arose "out of the

13

same facts that support[ed]" the contractual claims. *Id.* at \*\*6-7. So too here, Sesame's tort claim may not evade dismissal by dint of the pleading's invoking tortious-sounding magic words.

This conclusion finds further support in the equivalence of any conceivable harm or damages to Sesame from (i) the alleged unfair competition and (ii) the alleged breach of contract. Sesame's claimed reason why SeaWorld purportedly breached the Agreement has no plausible bearing on the damage that the breach caused. Because "the only damages alleged under either theory of recovery are identical for both claims, such damages are within the contemplation of the parties under the contract and the noncontractual claims must be dismissed as duplicative." *See IKB*, 40 N.Y.3d at 292 (citation modified); *see also* AC ¶¶ 142, 163 (alleging "harm" and entitlement to "damages" without differentiating the recovery available under the tort claim from the breach-of-contract claim). Overall, New York's independent-tort bar forecloses the unfair-competition claim, despite the claim's oblique allusions to SeaWorld's motives.

## B. Sesame Fails to Plead the Elements of Unfair Competition Under New York Law.

Apart from the independent-tort doctrine, Count III fails on its own terms. New York law recognizes two theories of unfair competition: palming off and misappropriation. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). Sesame pleads neither. The palming-off version prohibits selling "the goods of one manufacturer as those of another" in a manner "likely to cause confusion among the purchasing public as to the origin of the product." *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 333 (E.D.N.Y. 2014) (citations omitted). Sesame's pleading, however, fails to allege that SeaWorld passed off its services as Sesame's and fails to identify consumer confusion surrounding the source of any service. In addition, the brand uses that Sesame complains of are licensed under the Agreement, not source-confusing imitations.

The misappropriation version of the tort, meanwhile, prohibits "the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *ITC Ltd.*, 9

14

N.Y.3d at 478 (citation omitted). "[M]isappropriation encompasses the principle that one may not in bad faith misappropriate the results of the skill, expenditures and labor of a competitor." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 325 (S.D.N.Y. 2012) (citation modified); *see also Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 671 (1981) (cautioning that "commercial unfairness" does not necessarily equate with the tort of "unfair competition"). Yet Sesame's pleading is bereft of any such allegations. Far from an unauthorized competitor, SeaWorld has held an exclusive license to use the Sesame Street Elements at its theme parks since 1983, has paid Sesame hundreds of millions of dollars in royalties for that license over 40 years, and continues to operate under that license today. AC ¶¶ 33–35, 42, 49. Licensed use is the antithesis of the type of taking that the misappropriation theory targets.

In the canonical misappropriation case, for example, the International News Service copied a news bulletin that the Associated Press had compiled, and sold that pirated information to compete with the Associated Press's sales of the same bulletin; the U.S. Supreme Court reasoned that the International News Service's conduct amounted to misappropriation because it had taken the bulletin, which was the result of the Associated Press's "labor, skill, and money," and it had "endeavor[ed] to reap where it has not sown" by selling the bulletin as its own to newspapers, in direct competition with the Associated Press. *International News Serv. v. Associated Press*, 248 U.S. 215, 239–40 (1918). In more recent cases, misappropriation occurs when "a defendant takes a plaintiff's customer list and uses it to divert business away from plaintiff and to defendant"; or "when a defendant obtains access to a plaintiff's proprietary technology … as part of a potential partnership effort to win bids … and then uses that proprietary information to submit its own bid while freezing plaintiff out of the transaction." *See Red Mountain Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 181 (S.D.N.Y. 2021) (citing *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F.

15

Supp. 2d 500, 502–03 (E.D.N.Y. 2009); *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 504, 510 (S.D.N.Y. 2018)). The Amended Complaint alleges nothing of this sort.

Indeed, misappropriation allegations far richer than the Amended Complaint's have failed to state an unfair-competition claim. In *Red Mountain*, a medical-technology company alleged that a consulting firm, which potential investors had hired to conduct due diligence of the company, had obtained and misused the company's confidential information to dissuade investors, as part of a scheme to benefit the company's competitors. *Id.* at 182. Still, because the company had failed to plead that the firm had copied the company's technology and sold it "to medical providers in direct competition" with the company, or that the firm had "usurped an exclusive corporate opportunity that belonged to [the company] by taking it for themselves," the unfair-competition claim was dismissed. *Id.* If those allegations failed to state a claim, so must Sesame's.

More specifically, while Sesame alleges that SeaWorld issued SeaWorld Fun Cards to Sesame Place San Diego pass holders, redirecting them to other SeaWorld parks during the closure period (AC ¶ 158), that alleged conduct does not approach unfair competition. The Fun Cards are SeaWorld property; the pass holders held SeaWorld-issued passes; the destination parks are SeaWorld property. From start to finish, SeaWorld used its own property to direct its own customers to its own parks. The pleading alleges no taking of anything that Sesame labored to create. Nor does the pleading allege any consumer confusion about the Fun Cards' origin.

Likewise, while Sesame alleges that SeaWorld used the Sesame Place logo and Big Bird image in its unauthorized closure announcement, "misleadingly suggest[ing] that Sesame Workshop condoned or supported the closure" (AC ¶ 159), Sesame has contractually authorized SeaWorld to use the Sesame Place logo and Big Bird image. Sesame's allegation thus pertains to licensed use, not unauthorized appropriation. And the "misleading[] suggest[ion]" that Sesame

16

posits is not confusion about a product's origin, but rather confusion about whether Sesame "supported the closure"—that is, about Sesame's approval of a business decision.

Nor may Sesame sustain an unfair-competition claim through its allegation, on information and belief, that SeaWorld is "in active discussions with other IP licensing partners to replace Sesame at SeaWorld-owned parks" and has "cut[] back on promoting the *Sesame Street* brand." AC ¶ 160 (emphasis in original). Forward-looking consideration of future business arrangements is not a current taking of Sesame's property; the Agreement does not prohibit such consideration, and Sesame pleads no facts suggesting otherwise. As for reduced promotion, Sesame pleads the same conduct in its implied-covenant claim (AC ¶ 149), tethered to SeaWorld's obligation under Section 8.06 to maintain the quality of its offerings. The conduct is contractual through and through, and the pleading contains no allegations about taking, copying, or confusion about origin.

## C. The Agreement's Damages Provisions Further Militate for Dismissing the Claim.

The unfair-competition claim fails on yet another ground: every category of damages available on a New York unfair-competition claim is barred by, or channeled into, the same contractual remedy that Sesame already seeks in Count I. Because the tort affords no recovery distinct from the contract, it is duplicative and cannot survive. *See IKB*, 40 N.Y.3d at 292.

"[O]n an unfair competition claim, plaintiff may recover the amount it would have earned in the absence of a defendant's wrongful act, including lost profits directly attributable to the wrongful act or profits earned by the defendant that are derived from unfair competition." *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 566 F. Supp. 2d 305, 320 (S.D.N.Y. 2008). The Agreement bars or channels each of those categories. To begin, Section 16.02(b) provides that, on termination by Sesame for a SeaWorld breach, the "termination rights under Section 16.02(a) are [Sesame's] sole and exclusive remedy under this Agreement," and "neither Party would owe any amounts or sums to the other except for actual unpaid amounts or sums accrued to the date of termination."

17

Section 16.02(c)(i) confirms that the termination fees are "a fair, reasonable and appropriate measure of liquidated damages and as a sole remedy"; and Section 16.02(c)(ii) caps Sesame's aggregate recovery at a substantial amount. These provisions establish a single contractual mechanism for any economic recovery on a SeaWorld breach to the exclusion of all others.

Section 17.03 then separately bars wide categories of damages, in capital letters: "neither SEA nor SW shall be liable to the other or their respective Affiliates, as applicable, for any CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXPECTATIONAL, REMOTE, SPECULATIVE, PUNITIVE, EXEMPLARY, RELIANCE OR SPECIAL DAMAGES, OR LOSS OF PROFITS, DATA, CAPITAL INVESTMENTS, BUSINESS OR GOODWILL." § 17.03. The Agreement expressly extends this limitation to liability "based on breach of contract, tort, strict liability, breach of warranties, or otherwise." *Id.*

The intersection of *24/7 Records* and the Agreement defeats Count III. The first *24/7 Records* category—"the amount [a plaintiff] would have earned in the absence of a defendant's wrongful act"—corresponds to the royalty and license-fee revenue that Sesame alleges it lost. Sesame addresses how that figure is calculated in the Amended Complaint: the termination fees for Sesame Place San Diego are calculated by reference to the park's historical royalties, so the park's closure—by lowering current royalties—lowered the termination fees SeaWorld would owe. AC ¶ 67. The calculation that Sesame pleads runs through Section 10 on royalties and the Section 16.02(c) termination-fee formula. The second *24/7 Records* category—"lost profits directly attributable to the wrongful act"—is barred by Section 17.03's express prohibition on "LOSS OF PROFITS." And the third category—"profits earned by the defendant that are derived from unfair competition"—falls within Section 17.03's prohibitions on "CONSEQUENTIAL," "INDIRECT," "REMOTE," "SPECULATIVE," and "SPECIAL DAMAGES," as well as "LOSS

18

OF … BUSINESS" and "GOODWILL."

Under established New York law, moreover, the Agreement's provisions are enforceable. "A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss …, which the courts should honor." *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994). And although Sesame characterizes SeaWorld's conduct as willful, that characterization is not sufficient to disable Sections 16.02 and 17.03. "Repeated incantations of the word 'willful' do not magically transform an economically motivated breach into the egregious conduct required to negate an unambiguous contract term negotiated by sophisticated parties." *Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 556 (S.D.N.Y. 2014).

## II.  The Implied-Covenant Claim (Count II) Should Be Dismissed as Duplicative.

New York law does not "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (affirming dismissal of implied-covenant claim as duplicative). Consequently, an implied-covenant claim "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of … an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) (citation omitted) (dismissing implied-covenant claim that "rest[ed] entirely on the breaches of the [] agreement").

Here, Count II restates Count I and should thus be dismissed. Each predicate act pleaded as a breach of the implied covenant is pleaded elsewhere in the Amended Complaint as the breach of an express provision—save for one allegation. Sesame's allegation that SeaWorld failed to "maximize exposure" of the Sesame Street brand and promote themed offerings (AC ¶¶ 146, 150)

19

is the same conduct that, according to Sesame, breaches SeaWorld's quality obligations under Section 8.06 and the parallel representation in Section 14.02(b). AC ¶ 133. Sesame pleads the seasonal-schedule conversion of Sesame Place San Diego (AC ¶ 147) as a breach of those same provisions (AC ¶ 133) and of the approval rights in Sections 9.02 and 8.08 (AC ¶ 129). Sesame pleads the replacement of Sesame Street Bay of Play at SeaWorld San Antonio (AC ¶ 148) as a breach of Section 6.05(b)'s termination-fee obligation. AC ¶ 137. And Sesame's reduced-promotion allegation (AC ¶ 149) runs into a remedy that the parties negotiated and priced: Section 10.04(c) guarantees Sesame a minimum annual Licensed Products Royalty for the Sesame Lands, and Section 10.05(c) obligates SeaWorld to pay a "Guarantee Shortfall" when earned royalties fall below that minimum—a shortfall Count I alleges as overdue and recoverable. AC ¶¶ 50, 53, 128.

The "fruits" of which Sesame claims to have been deprived—royalties, brand exposure, and termination fees (AC ¶¶ 146–47, 150)—are not implied benefits at all. Each is an express contractual entitlement that Sesame in Count I seeks to vindicate under Sections 10, 8.06, and 16.02. AC ¶¶ 128, 133, 139. Sesame in Count II then demands the same damages as Count I, plus the punitive damages addressed in Section III. AC ¶¶ 152–53. The adjectives—"willful[]," "bad faith," "retaliat[ory]" (AC ¶¶ 150–51)—do not give the claim a separate identity. *See supra* at I.C.

Proving the point, paragraph 154 pleads the implied covenant claim "in the alternative" "[t]o the extent any of the aforementioned actions relate to actions alleged to be explicit breaches of the Agreement." The hedge confirms the defect: an implied-covenant claim that duplicates a breach-of-contract claim fails, *see Harris*, 310 F.3d at 81, and alternative pleading offers no refuge where, as here, no party disputes the Agreement's validity and both counts rest on the same conduct and seek the same relief, *see Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *12 (S.D.N.Y. Sept. 29, 2016) ("[C]ourts in this Circuit dismiss implied covenant claims, even

20

when pled in the alternative, when the implied covenant and contract claims are based on the same facts."); *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008) ("[A] party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim.").

The single allegation in Count II that does not appear in Count I—that SeaWorld, on information and belief, is in "active discussions" with other IP licensing partners (AC ¶ 148)—fails for a distinct reason: the Agreement does not prohibit it, which explains why it is not pleaded as an express breach. The implied covenant cannot manufacture an exclusivity-of-planning obligation that the parties never negotiated. *See Murphy v. Am. Home Products Corp.*, 58 N.Y.2d 293, 304 (1983) (observing that the covenant operates in "furtherance of other terms of the agreement," and "[n]o obligation can be implied … which would be inconsistent with other terms of the contractual relationship"). Rather, the Agreement expressly contemplates that SeaWorld may permanently close a Sesame Land and prices the consequence: the Section 6.05(b) termination fee that Sesame already seeks in Count I. AC ¶¶ 60, 137. Exploring prospective replacement arrangements deprives Sesame of no benefit that the Agreement actually confers during its term.

## III. The Request for Punitive Damages Should Be Dismissed.

Sesame's punitive-damages request is equally defective. Section 17.03 of the Agreement prohibits "PUNITIVE" or "EXEMPLARY" damages. This prohibition—which applies "whether such liability is based on breach of contract, tort, strict liability, breach of warranties, or otherwise"—is enforceable here. *See supra* at I.C. (citing, *e.g.*, *Ace*, 5 F. Supp. 3d at 555).

Moreover, Sesame's pleading comes nowhere close to satisfying the Court of Appeals' four-part test for punitive damages where, as here, the claim has its genesis in a contractual relationship: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious

conduct must be of [an] egregious nature … ; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (citation modified).

Sesame fails at the first prong because it pleads no independent tort. *See id.* at 316 ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie."); *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) ("A willful breach of contract does not warrant the imposition of punitive damages [].").

Nor does Sesame satisfy the fourth prong. Sesame pleads no public-directed pattern of misconduct. Its allegations concern private-licensing disputes arising from a single contractual relationship, including alleged conduct aimed at one counterparty in retaliation for one arbitration recovery. *See, e.g.*, *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 95–96 (2d Cir. 2005) (setting aside punitive-damages award where the breaching conduct was an isolated private dispute, not conduct aimed at the public generally); *BDG Gotham Residential, LLC v. Western Waterproofing Co.*, 2024 WL 4349163, at *11 (S.D.N.Y. Sept. 30, 2024) ("A single incident, even an egregious incident perpetrated against the public, is insufficient to evince a pattern of conduct harming the general public.") (citation modified); *Huang v. iTV Media, Inc.*, 79 F. Supp. 3d 458, 465 (E.D.N.Y. 2015) (dismissing punitive-damages request where pleading concerned a "single contract, not a 'pattern' or broader scheme") (citation modified). The pleading does not begin to clear the high bar for punitive damages.

## IV. The Amended Complaint Should Be Dismissed in its Entirety as to United.

While SeaWorld—United's wholly owned subsidiary—"is a party to the Agreement" (AC ¶¶ 16, 125), United is not. Yet Sesame names United as a defendant based on its allegation that United "manifested its intent to be bound by the Agreement through participating in negotiations

22

for the Agreement." AC ¶ 126. That purported basis for holding United liable fails as a matter of law, and the Amended Complaint should be dismissed in its entirety as to United.

"A parent corporation may not be held liable for the contracts of its subsidiary solely because of stock ownership." *A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 374 (1st Dep't 1979); *accord N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (recognizing that corporate separateness is "fundamental"). Under the narrow exception that Sesame attempts to invoke, a parent may be bound to its subsidiary's contract if the parent's own conduct "manifests an intent to be bound," inferred from the parent's participation in negotiating the contract. *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172 (1st Dep't 1997). That is the only theory alleged as to United—Sesame does not attempt to plead alter ego or veil-piercing—and the decisions applying that theory show how far short paragraph 126 falls.

In *A.W. Fiur*, for instance, the parent negotiated the contract itself, told the plaintiff its subsidiary would sign for currency and tax reasons, issued all instructions, and conducted the entire business relationship while the subsidiary's "sole function" was to pay commissions. 71 A.D.2d at 372. Even that record—total parental control of negotiation and performance—sufficed only to raise a question of fact on whether the parent could be held liable. *Id.* at 373–74.

Pleading-stage decisions sustaining an intent-to-be-bound theory follow the same pattern, identifying the parent's conduct with specificity. *See, e.g.*, *Resorts Grp., Inc. v. Cerberus Capital Mgmt., L.P.*, 213 A.D.3d 621, 623 (1st Dep't 2023) (complaint alleged the parent, by name, "conducted all the negotiations"); *Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*, 2020 WL 6151491, at *3–4 (S.D.N.Y. Oct. 20, 2020) (complaint named five parent employees and the operative act each performed). Where a pleading cannot supply that specificity, however, the theory fails—even on allegations of parental involvement far more substantial than anything

23

alleged here. Thus, in *World Wide Packaging,* the parent "initially approached [the] plaintiff" to establish credit accounts and its employees were "frequently … involved in the creative aspect of the transactions by approving the order designs"—but the First Department deemed the theory insufficient: the complaint contained "no allegation about who negotiated the pricing or the general terms," no allegation that the parent "directly participated or micro-managed each transaction … or acknowledged that it was the actual party in interest," and was "silent on who paid." *World Wide Packaging, LLC v. Cargo Cosmetics, LLC*, 193 A.D.3d 442, 442–43 (1st Dep't 2021).

Sesame's paragraph 126 sits on the wrong side of these markers. Its negotiation allegation is a single verb, hedged even as to headcount: "at least one officer" of United, Marc Swanson, "participated in the negotiation of the Agreement." Sesame does not allege one act Mr. Swanson performed, one term he negotiated, or one communication he sent; it does not allege that United negotiated the pricing or general terms, conducted the negotiations, or acknowledged itself the real party in interest—omissions that *World Wide Packaging* held fatal on stronger facts. And the rest of the pleading reinforces the defect: having defined the two defendants collectively as "SeaWorld," Sesame never again differentiates them. Outside paragraph 126, United is never separately mentioned in the allegations, and every alleged act of performance and breach (operating the parks, paying and withholding royalties, submitting reports, closing attractions, issuing announcements) is the licensee-operator's conduct.

Indeed, while New York law measures intent to contract by "the totality" of "expressed words and deeds," and forbids "disproportionate emphasis" on "any single act, phrase or other expression," *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400 (1977), Sesame's intent-to-be-bound theory rests on disproportionate emphasis: one word— "participated"—is asked to carry the inference, while the totality points the other way. United did

24

not sign the Agreement, and in the nine years since execution is not alleged to have paid a royalty, submitted a report, or performed or breached a single obligation under it. While the *A.W. Fiur* subsidiary's "sole function" was paying commissions while the parent did everything else, 71 A.D.2d at 372, the roles here are reversed: the subsidiary is alleged to have done everything, and the only act the pleading ascribes to the parent in nearly a decade is a single mediation request.

Yet the mediation allegation cannot carry the claim, either. Sesame alleges that on January 13, 2026, United "submitted a request to JAMS initiating mediation for the Agreement under its own corporate name, and thus continues to participate in negotiations related to the Agreement." AC ¶ 126. Taken as true, the allegation fails twice over. First, it is temporally incapable of supporting the inference: assent is manifested in "the creation and negotiations of the contract," *Powerbox*, 2020 WL 6151491, at \*4, and a mediation request filed in 2026 says nothing about whether United manifested an intent to be bound when the Agreement was made in 2017. Mediating a dispute about the Agreement is not negotiating the Agreement. Second, Sesame's own allegations supply the contractually compelled explanation for the act. As alleged, Section 17.01 prescribes a mandatory pre-suit dispute-resolution process: notice, senior-management discussion, and mediation once a party invokes it. AC ¶¶ 108–15. A parent that participates in the contractually required mediation of a dispute threatening its wholly owned subsidiary is protecting the subsidiary, not volunteering for liability on the subsidiary's contract. A contrary rule would make ordinary parental participation in pre-suit dispute resolution a forfeiture of corporate separateness—an untenable result that New York courts have neither endorsed nor hinted at.

## CONCLUSION

Counts II and III of the Amended Complaint, and the request for punitive damages, should be dismissed, and the Amended Complaint should be dismissed in its entirety as to United.

25

Dated: New York, New York
      June 19, 2026

**KASOWITZ LLP**

By:  /s/ *Marc E. Kasowitz*
    Marc E. Kasowitz
    Amit R. Vora
    Maxwell Sandgrund
    1633 Broadway
    New York, New York 10019
    Tel. (212) 506-1700
    Fax (212) 506-1800
    mkasowitz@kasowitz.com
    avora@kasowitz.com
    msandgrund@kasowitz.com

    *Attorneys for Defendants*

26